Okay, when you're ready. May it please the Court, my name is Brent Plater. I represent the plaintiff appellants in this matter. I'd like to reserve five minutes of my time for rebuttal. Okay, the count's down, so keep your eye on it. Thank you. There are two issues that the Court needs to resolve in this matter, both of them pertaining to mootness. The first question is whether the District Court erred in declaring our case moot below when the consulting agency, the Fish and Wildlife Service, issued a biological opinion to the action agency, the Army Corps of Engineers, but before the Army Corps of Engineers agreed to incorporate those provisions of the biological opinion into a binding permit issued to the defendant appellate. Are the defendants required to abide by the ITS, the Incidental Take Statement, and the issued in association with the biological opinion, whether or not the permit is issued to the Army Corps of Engineers? They are not. What they are required to do is not take listed species. That's a prohibition found in Section 9 of the Endangered Species Act. Right. No, I got that. But once we get the Incidental Take Statement, are they allowed to act consistent with that? Not with immunity from take. They may act. The city may act. But when they act, in the absence of having that Incidental Take Statement cover their activities, they are not immune from take liability. Well, no, I guess that's my question. Once the Incidental Take Statement is issued, you're saying that even if they abide by it and they take one frog, which is allowed, you say they're not immune from liability? They're not immune from liability. Why not? Well, I think the best evidence of that is the position of the Fish and Wildlife Service itself. And in Docket Number 29, Exhibit A, we have a letter from the Fish and Wildlife Service to the Army Corps of Engineers explaining this very point, where the Fish and Wildlife Service said the biological opinion is effective only upon issuance by the Corps of the authorizing action for which consultation was requested pursuant to Section 7 of the Endangered Species Act. The Incidental Take Statement included in the biological opinion thus exempts the Corps and the applicant from the take prohibitions of Section 9 of the Act only when the action is authorized by permit issued by the action agency. The measures set forth in the biological opinion's Incidental Take Statement must become binding conditions of any grant or permit issued to the applicant by the Corps in order for the exemptions of the Act to apply. And the reason they didn't just write this out of the blue. This opinion is consistent with a long line of agency interpretation going back to the very day that the regulations were first created by the Fish and Wildlife Service. It's not so consistent with our case law, right? It is also consistent with the case law. The cases that have been cited in this appeal all address an instance where the biological opinion is issued to the action agency, and then the agency is the entity that's directly taking the activity that cause is taked. There is no third private party that's getting a permit issued to it. Does Ramsey come within the description that you've just given? It does. And the reason that's so, Ramsey had, of course, these very strange factual circumstances around it where the entity that applied for a biological opinion was this compact that included Federal agencies, States like Oregon and Washington, and several Indian tribes that were ordered to behave according to a judicial decree. And that compact as a whole became the Federal agency that applied for consultation. Now, a separate entity, an electric utility, then tried to argue that when Washington and Oregon, members of that compact, then did things to effectuate the terms and conditions of the biological opinion, a separate permit was required through Section 10 of the Endangered Species Act. But the Court found that was not so, and that's consistent with our interpretation of the Section 7 requirements, the Fish and Wildlife Service's interpretation of the Section 7 requirements, because at that point, Oregon and Washington were, in fact, Federalized through that compact. It was the compact as a whole that was implementing these fishing regulations that were at stake in Ramsey v. Cantor. And that's even in the case the Court explains, that it was the compact that was the, as a whole, that was the action agency in that case that received the biological opinion and was then taking subsequent activities to regulate fisheries. And I think if you look at the terms and conditions of the biological opinion that apply in this case, the same outcome applies. In that opinion, you can find it in the Exeter record, page 20, the Fish and Wildlife Service explains that the Corps of Engineers in the city must implement the terms and conditions so they become binding conditions of any grant or permit issued to the city before the take prohibitions, before the city becomes immune to the take prohibitions. They go on to say that if the Corps or city fails to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit or grant document, then they will not retain their immunity from take. There was hard-fought litigation, really well done, it seemed to me, about whether or not the ITS is self-effectuating, and we've been all around that. But at this point, since the permit is issued, do you want to address the mootness argument in light of that? Yeah. So if the permit was issued by the Army Corps of Engineers to the city and then there was a subsequent action by a State agency to perfect that permit, and if that, our case, our view is that our case qualifies for an exception to the mootness doctrine under those principles because it's a classic issue that's capable of repetition yet evading review. Dependency, you know, the ---- But I'm sorry. Apart from the exception, you don't dispute that it is moot? The case, once, you know, we are, of course, challenging certain aspects of that permit as well. And, you know, we believe that there's those challenges will become successful and eventually unravel that permit. But if that permit is, in fact, you know, a perfected permit from the Army Corps of Engineers, at that point is when a case could be declared moot. Well, but I'm talking about today. Right. I thought you were conceding to Judge Kirsten that the case is moot and you're invoking the exception, evading review exception. Yeah. I guess, you know, there's two ways you can think about that exception. Is it moot and there's an exception or just an exception? Well, I'm thinking of it that way. I'm thinking of it that way. To be real clear. The only exception is not moot. My question, if it wasn't well articulated, it probably wasn't, is that. It seems to me that the argument in the district court had to do with whether or not the ITS was self-effectuating before the permit was issued. Now the permit is issued. My view is isn't this case moot? And aren't you really needing to rely upon an exception to the mootness doctrine? That's right. At this point, the exception to the mootness doctrine clearly applies because it was during the pendency of this appeal that the Army Corps decided to finally issue that permit to the city. And it's a classic example. These kinds of things will come up again in this long-running dispute around the killing of an endangered species. We'll come up again with respect to this golf course. We'll come up again with respect to any client that you might have. We'll come up again in the United States. What do you mean we'll come up again? All of the above. We know that. We'll come up with respect to this golf course? That's right. No, no, no, please. I interrupted you. Well, say more. Why is it going to come up again in context of this golf course? For two reasons. The current biological opinion they have has an expiration date. It expires 10 years from the date of issuance. And so we will see another permit at some point in the future. And we have a reasonable expectation that a similar issue will happen. The biological opinion will be issued. The Army Corps will hem and haw about whether they're willing to incorporate those terms and conditions into a binding action agency permit to the city. And then we'll be in this limbo about whether or not there will be any take liability in the meantime for the golf course. Well, because the permits aren't issued forever, and we don't know what's going to happen in 10 years, how many frogs there are going to be, how many snakes there are going to be, what the status of any of this will be. But my understanding in the short term is that the permit is issued and that the golf course and the Corps, depending on whether you're talking about maintenance or the construction, will have to file reports, and you'll have access to those reports so you'll know how many frogs and snakes have been lost in the process. And you'll have the ability to monitor and initiate additional litigation if you think that the line has been crossed. Well, that's true for any claims we may have about the validity of the city's implementation of the permit. But the question before the Court that we're raising is there's this time period, this gap, between when the biological opinion is issued to the action agency and the date that the action agency agrees to comply with those terms and conditions and put them into a binding permit to the city. If there's another biological opinion. I mean, if we get there. We don't know what's going to happen in the next 10 years. You're assuming, I think, but please correct me if I'm wrong. I'm sure you have greater expertise in this area and certainly in this case. I'm all ears. But it seems to me that your mootness exception is really premised upon the assumption that all of this process starts all over again in 10 years. So that's one reason. The second reason is we know that the city has this bifurcated plan for their vision of what will happen at Sharp Park Golf Course. The first phase of that plan was a biological opinion covering the operations management of the golf course presently. The next phase, which could happen this year when this master plan for what's called the Natural Areas Plan comes out, will require a second consultation, again for dredging and filling wetlands at Sharp Park in a different area of the lagoon system. And that will have to go through another consultation process. And this is by design that they built through the Army, cooperating with the Army Corps of Engineers and the Fish and Wildlife Service. And at that point we expect a second biological opinion, dealing with a larger construction action at the golf course and similar kinds of activities on day-to-day management that will have to be issued separately by the Fish and Wildlife Service. And we could be in the same place all over again. Fish and Wildlife Service wants the Army Corps to oversee and supervise several aspects of the golf course's operations that kill endangered species. The Army Corps is going to be in a position where they say, well, we don't really do that. We move water around. We regulate the dredging and filling of wetlands. But we don't actually do these other things. And we'll be in this limbo about whether or not there will be any ability to challenge the killing of endangered species that happens during that interim process. You can help me out in the following way. We've been so far discussing whether or not this case is moot. Help me out by reminding me what your underlying dispute was before this became arguably moot. What were you objecting to? So we brought a claim under Section 9 of the Endangered Species Act, arguing that the golf course had been killing both endangered species for a number of years without any permits whatsoever. And that has been vindicated by the content of the biological opinion. Do you object to the substance of the biological opinion and the ITS? There are elements of the biological opinion that we do believe are improper. Have you challenged those? We haven't yet because our position is until recently that the biological opinion was not in effect, that it wasn't effective until the Army Corps of Engineers perfected that permit process. Have you sought to challenge them in this lawsuit? Not in this lawsuit, no. That's not part of it. That would be a separate lawsuit altogether. So what was this lawsuit about when it was first filed? So the lawsuit when it was first filed was about violating the Endangered Species Act's Section 9 prohibition in the absence of any permits. Right. So there was no biological opinion. There was no ITS. There was no permit. There was no nothing. And in your view, they were killing frogs and snakes. That's correct. And if we were to challenge, sorry. And after the lawsuit's filed, we get a biological opinion and an incidental take statement. And eventually, while this is on appeal, we get a permit. Right? That's right. So the lawsuit that you had seems to me to have gone away. That is to say, you were saying you were doing this without a permit. You were doing this without an incidental take statement. You were doing this without a biological opinion. Well, they have all those things now. So why isn't this moot? If I understand your question correctly, it goes back to this exemption to the mootness doctrine, that in this case in particular, during the pendency of our appeal, before we could litigate this question about whether the permit applies in between the date that the Fish and Wildlife Service takes action and the date that the Army Corps takes action, which was about 16 months in this case, it was a very long period of time. We're not talking about days or some ministerial time period. It was a full season, breeding season for the California red-legged frog plus some. During that time period, did the incidental take statement give the Gulf Corps immunity from the endangered species they killed out there at Shark Park? And that question — Counsel, that bracketed period of time I think is the time you're talking about that we could have to endure again, that your client may have to wait that period of time, right, again. Precisely. Either because the whole process has to ramp up again in 10 years when the permit runs out or because there's another grand plan that's about to be undertaken. But in the meantime, doesn't the Gulf Corps have to abide by the conditions in the permit? In the meantime, they must comply with the terms in the permit to retain their immunity from ESA liability. So if this second construction project or whatever it is ramps up, those conditions are going to be in place. Ah, but see, that's a separate action that is not covered by this existing biological opinion. Well, it covers all of the maintenance activities for the Gulf Corps, doesn't it? It covers some of the maintenance activities for the Gulf Corps, yes. But it doesn't cover every maintenance activity, and it certainly doesn't cover this new larger construction project that they're proposing to do into the future. And that will have a separate set of liability issues that we will need to, you know,  But if you're asking us to rely on that as an exception to the mootness doctrine, then you're really asking us to use a crystal ball. We have nothing about that. We don't know anything about that. Those are big assumptions. Well, maybe I'm misunderstanding your question, but certain elements of Gulf Corps operations currently, even if we put aside the construction project and whether or not that happens, certain elements of Gulf Corps operations are not covered by the biological opinion. So, for example, there's elements of how much water they drain from the wetland every year, not covered by the biological opinion at all. You just said you, in response to Judge Fletcher, you just explained you haven't challenged that. We haven't because our position has been in this appeal that the biological opinion was not effective until the Army Corps issued its permit, which happened, you know, in the grand scheme of things relatively recently. We've got 60-day notices out on that issue, but we haven't brought a claim yet on that issue. Okay. Well, we have succeeded in using up all of your time. Let's hear from the other side, but we will make sure to give you a chance to respond. Thank you. Good morning, Your Honors. May it please the Court, I'm Deputy City Attorney Jim Emery, representing the city and county of San Francisco. I would like to share my time with Mr. Palmore, who is representing Intervenor, the San Francisco Public Golf Alliance. Okay. How do you roughly intend to divide up the time? About half and half. Okay. I got advice a long time ago that it's better to sit down even before my time is done, so that's my goal, actually. I want to take the Court back a little bit to actually what did happen in the district court in response to some of the questions in the last few minutes. This case was filed as a Section 9 case saying that we didn't have a permit, just as we reviewed, the Court reviewed a little while ago. There was a motion for preliminary injunction. The district court denied that motion for preliminary injunction because there was no imminent risk of harm to the species of the population. Then there were cross motions of summary judgment. And the district court denied the cross motions for summary judgment and stayed the action because the city was engaged in consultation with the Army Corps of Engineers and the Fish and Wildlife Service. And then ultimately, when the city obtained the biological opinion from the Fish and Wildlife Service, that is when the district court dismissed this action. Obviously, the gap period that appellant, that wild equity is concerned about here, that gap period would have been a continuation of this day if appellant's theory is correct. We're talking about a very academic question here, whether the case was moot then or the case was moot now. For all the reasons Judge Ilston and the district court said in the opinion dismissing the case, the case was moot then. Wild equity would have had a new cause of action against San Francisco should San Francisco not file or not comply with the terms of the biological opinion, but that wasn't the lawsuit that was filed. In our briefs, we refer to both the statutes and the regulations that make very clear that the biological opinion is effective when it is issued. And I won't go through the numbers again. They're in our brief. But the biological opinion itself has several conditions, and it says explicitly, the city must do these things. It has nothing to do with the Army Corps of Engineers. The city had obligations in the biological opinion, absolutely independent of involvement by the Army Corps of Engineers and independent of any oversight by the Army Corps of Engineers. So now I want to touch on the exception that wild equity is invoking to the mootness here, capable of repetition but evading review. Wild equity, Mr. Plater explained two scenarios that he believes would cause the scenario to come up again. As the Court suggested, the scenarios are speculative, require crystal ball. First off, at the end of the 10 years, we know when the current biological opinion is going to expire. We will get our ducks in a row well before the expiration of the current biological opinion should the city need another biological opinion under Section 7, which is, again, speculation. The project that Mr. Plater referred to in the reply brief and at argument today, that is the city's plan for habitat restoration plan. Should CEQA review be complete on that plan, which is why we haven't done it yet, because we have to go through the state law CEQA review, once CEQA review is complete on that plan, then the city will seek an incidental take permit under Section 10 of the Endangered Species Act. We won't go through the consultation under Section 7 again. The local agency is allowed to get an incidental take permit under Section 10 directly from the Fish and Wildlife Service. That's been the long-term plan. That's been the state law CEQA process. If you get a permit, an incidental take statement under Section 10, I think the legal question as to what happens in the interim that's presented here is not likely to be presented. No, it's not likely to be presented because there isn't the same kind of consultation and what Mr. Plater has tried to sort of describe as this limbo period. But, yeah, the issue that he's concerned about, and I'm sympathetic with his concern, frankly, I have to say, I think it just isn't going to show up if you're after a Section 10 ITS. That is correct. That is correct. And what if it does? Is his remedy at that point to seek an injunction again? Wouldn't he be right back where he started? He would be — if the city has no permit, is in a situation when it has no permit, then there would be a Section 9 claim, presumably, in 2024. So the answer — isn't the answer yes, he'd be right back where he started? That's where he started. Well, except he'd be starting with a new landscape with whatever the scenario is, whatever's going on there. I appreciate that. But I'm just talking about procedurally. Yes. Then he'd need to get — yeah, okay. Absolutely, yes. So we only talked about the first prong of capable of repetition and evading review. And the test is whether — for the evading review part is whether the dispute is inherently limited in duration, such it is likely always to become moot before the federal court litigation is completed. And that's not true here either. And Wild Equity explained in its briefs below why it is not true. Wild Equity said to the district court, the case isn't moot because what if the Army Corps of Engineers never issues the 404 permit? What if the Army Corps of Engineers delays issuing the 404 permit? What if the Army Corps of Engineers issues the 404 permit, but doesn't incorporate all the conditions of the incidental — of the biological opinion? Under any of those three scenarios, which is what Wild Equity purported to be concerned about in front of the district court, this case is not of an inherent — the dispute is not of an inherently limited duration. But none of those problems that Wild Equity said it was worried about in the district court have come to pass in this case. And that is why this case is now moot now. That is why this case does not qualify for the exception to mootness for capable of repetition but evading review. If there are no further questions, I will yield the rest of my time. Okay. Thank you. Thank you, Your Honors. Joseph Palmore for interveners. Mr. Plater opened up and said the first issue before the court was whether the district court was correct in dismissing the case on mootness grounds. But as he later conceded, that challenge, the appellant's challenge to the district court's mootness determination is itself now moot. And for that reason, the appeal should be dismissed. Mr. Plater said that he qualifies for an exception, the capable of repetition yet evading review. And as Mr. Emory explained, neither prong of that exception is applicable here. The biological opinion that covers golf course maintenance operations lasts for 10 years. So any speculation about what's going to happen at the end of that is so far off into the discussion, which this Court has described as available only in extraordinary cases. This is not such an extraordinary case. And one reason for that is because of the unique nature of the biological opinion here. And that's further evidence of the fact that this cluster of circumstances is highly unlikely to appear again at Sharp Park. The biological opinion here is bifurcated. It imposed some duties on the Army Corps and the city as part of the permitting process for what the biological opinion calls the construction project. It separately imposed a series of obligations on the city directly and only on the city governing golf course maintenance and operations. Neither side has discussed any reported case that deals with a bifurcated biological opinion like this. The reason that it was appropriate is because there is a regulation saying that the Fish and Wildlife Service must take account of interdependent and interrelated effects. And it concluded in its expert judgment that the golf course maintenance and operations were interrelated and interdependent with the construction activity. So therefore, it imposed a series of very significant obligations on the city with respect to ongoing golf course maintenance and operations, how the grass is cut, how the grass is mowed, and those obligations, contrary to what Mr. Plater said, were immediately effective and enforceable. And the best evidence of that is at excerpts of record, page 66, where the biological opinion, the incidental take statement, imposed a series of obligations on the city and the time clock for beginning those obligations starts with the issuance of the biological opinion itself. The clock does not start when some later permit by the Army Corps is issued. They are a series of deadlines, three months from issuance of this opinion, six months. The city viewed those obligations as immediately effective and complied with them. And for that reason, because they were immediately effective, they provided the immunity that the Endangered Species Act provides. And it's important to point out, too, that to the extent that there's a suggestion on the other side that it was somehow improper for the incidental take statement to encompass these golf course operations and maintenance activities, that's a challenge they could have brought but have not brought under the APA. Bennett v. Speer, the Supreme Court case, is quite clear that issuance of a biological opinion is final agency action that can be challenged under the Administrative Procedure Act, and they haven't done that here. So to overcome the mootness here, they would have to invoke this exception, and they would have to show not only would there be another Section 7 process at Sharp Park that would subject their members to harm, but further, that it would be another bifurcated process like this that would apply not only to the core in its permitting activities, but also to the golf course and its ongoing operations. And I think that's sheer speculation, and there's no basis for invoking the exception here. In other words, it's an academic question. It's a purely academic question. So we think that the the You're speaking to a former academic. I mean that in a good way, Your Honor. It's an interesting question and an academic question. But we think that the proper course here is because the appeal itself has become moot, that the proper disposition is to dismiss the appeal as moot, because the Well, the case has become moot, not just the appeal. Well, we think that the case was moot in the district court, and then the appellant's challenge to the district court's mootness determination has itself become moot. It's kind of mootness squared, exactly. It's doubly moot. So we think the proper disposition in a case like that is to dismiss the appeal. Okay. Thank you, Your Honors. We took you up to your time limit. Let's put two minutes on the clock so you can respond. Your Honor, I believe I reserved five minutes of my time at the beginning. Yes, you did reserve five minutes of your time. But the normal way is if you don't make us stop talking, it's kind of in our discretion as to how much time you actually end up saving. Let's put two minutes on the clock, but I don't want to take this way of putting any pressure on you. So long as you're saying something interesting, you can go past two minutes. No pressure. No pressure. Fair enough, Your Honor. I shouldn't tease. Just say what you need to say. Sure. So one thing to keep in mind is that when we do challenge the biological opinion, that, of course, will not involve any of the parties that are on appellees here. That would be a challenge to the Fish and Wildlife Service, the people who authored the agency that authored the biological opinion. So it really has very little to do with the activities of the appellees in this case. It was a totally separate challenge. Now ---- I'm sorry. How does that help you here? Right. Well, I just wanted to clarify that our challenge to the biological opinion is against ---- it's a totally separate case that doesn't have an effect on this time period issue that was of primary concern in our appeal, whether or not the ---- But I understood ---- forgive me for interrupting you, but I understood that you've agreed that the original controversy is moot and you need to fit into the exception, right? Yes. All right. And so how does that ---- and this goes to Judge Davis's question. I mean, how does the fact that that would be a completely different action against the Forest Service help you fit into that exception?  here with Sharp Park Golf Course and, of course, as I mentioned before, in the larger scheme of things, biological opinions are issued regularly from the service to an action agency. And this pendency of time period between when the terms and conditions become binding on the action agency and the date of the biological opinion, that time period is not going to change. It won't be affected in the future by any challenge, successful or not, against the existing biological opinion. That's going to occur in separate agency actions issued by the Fish and Wildlife Service that we have a reasonable expectation will occur, either in the case that's before you on the controversy here, other cases dealing with Endangered Species Act around the country, or somebody else's cases altogether. And so somehow a challenge to that biological opinion doesn't impact whether or not that time period issue is ---- was illegally resolved or improperly resolved by the court below and doesn't affect whether it's live presently under the mootness exception because it really can't alter that time period in the past. And the other thing I'd like to mention, I think one thing that is clear is that there are these two different processes between sections to achieve a permit under the Endangered Species Act. The Section 7 process, which governs Federal actions, and the Section 10 process, which governs non-Federal actions. And what the statute itself explains, and the reason why it is so critical for the action agency to incorporate those terms and conditions into a binding permit, is that it is the action agency's obligation. The action agency shall ensure that the take prohibitions of the Endangered Species Act are not implemented. And in the absence of the Army Corps incorporating those terms and conditions into its permit, it cannot satisfy its statutory obligation to ensure that the Endangered Species Act is not violated. But given that, just accepting what you just said for purposes of my question, we were just informed that the likelihood 10 years down the road is that they will not go through Section 7 but through Section 10. And if that's so, the question that you think we should answer, because capable of repetition yet evading review, will not be presented. How do you respond? Well, you know, that's the first that's ever been stated in this case. It's the first time I've heard of this idea that they'll somehow go through a Section 10 process in the future. It's not what's been presented in the record of this biological opinion. But you see, at this point we're entirely at speculation in terms of what's going to happen in the future. You're speculating they'll do through Section 7. They're saying they'll go through Section 10. I have no way of knowing. Sure. And I think the issue about this capable of repetition yet evading review, it applies not simply, not as strictly as the appellees suggest, that it doesn't have to be absolutely certain that it will we will somehow lapse over. Capable of repetition. Capable of repetition, exactly. And it doesn't even have to be just in the exact same facts and circumstances that we have before this case. But we are talking about Article III jurisdiction here. Of course. This is not a casual walk down the fairway, so to speak. Fair enough. Fair enough. Yes, but I think the exception still applies. As it applies to this case and the very issue that we're finding to be problematic in the district court's order, I mean, the time period that we saw here between when the biological opinion was issued and when the Army Corps took action was extraordinary. Normally, it's a matter of days between the time period that the biological opinion is issued and the Army Corps' action following up with a permit. Maybe a few weeks. Well, all the more I'm afraid that your capable of repetition yet evading review issue drops away because your premise and the argument here on, you want to know what's going to happen in that gap period. But if the gap period is just a matter of days or weeks, you know, that's pretty  Well, it could be days or weeks. Right? And you're saying normally it is. You just told me that. It often is, and I think that actually makes it more likely that it will evade review. Because the other thing that's different about this case You could appeal the denial of a preliminary injunction, not to suggest that the standards are exactly the same or that you'd get the same substantive opinion, but there is that option as well. Yes, but we are beyond that phase at this moment in the case. But you won't be when this issue comes up again. Well, most likely what will be, it may be a section 9 challenge that comes up again before the court. And if somehow we were to lose a preliminary injunction, that's true, we could appeal that decision. Okay. Good. Well, it turns out you've got six minutes. So thank you. Thank you very much. Thank both sides for their arguments. The case of Wild Equity Institute v. City and County of San Francisco et al. submitted for decision. The last case on the argument calendar this morning, Williams v. Adams. Thank you. Thank you. Thank you.
judges: Davis, Fletcher, Christen